**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Crim. No. 14-049 (CKK)** |
| | ) | |
| **JEFFREY E. THOMPSON,** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____ )

**JEFFREY E. THOMPSON'S MEMORANDUM IN AID OF SENTENCING**

Tobin J. Romero (D.C. Bar No. 461273)
Alex G. Romain (D.C. Bar No. 468508)
J. Liat Rome (D.C. Bar No. pending)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000

*Attorneys for Defendant Jeffrey E.*
*Thompson*

July 15, 2016

## TABLE OF CONTENTS

ARGUMENT .................................................................................................................2

I.  Mr. Thompson Has Cooperated Fully and Extensively with the Government...................3

II.  A Non-Custodial Sentence Is Consistent with Sentences in Comparable Cases and

Related Proceedings. ......................................................................................................4

III.  Mr. Thompson's Life Has Been Defined by His Devotion to Uplifting and

Serving Others. ..............................................................................................................7

    A.  Upbringing and Family ........................................................................................8

    B.  Education and Early Professional Life .................................................................9

    C.  Helping Others Help Themselves: Employment and Support of Small

        Businesses ...........................................................................................................11

    D.  Individual Acts of Kindness and Generosity of Spirit ..........................................13

    E.  Support of Worthy Causes ...................................................................................15

CONCLUSION ............................................................................................................21

Jeffrey E. Thompson, through undersigned counsel, respectfully submits this memorandum in aid of sentencing.

Mr. Thompson will appear before this Court for sentencing on August 12, 2016, having pled guilty to a two-count Information alleging one count of federal conspiracy in violation of 18 U.S.C. § 371 and one count of conspiracy under the laws of the District of Columbia, in violation of D.C. Code § 22-1805a(a)(1).  The government and Mr. Thompson have entered into a plea agreement pursuant to which the government will move to dismiss the federal conspiracy count at sentencing.  Mr. Thompson will thereafter be sentenced for the District of Columbia offense.  Under the plea agreement, any sentence of incarceration may not exceed six months for the District of Columbia offense.  *See* Dkt. No. 7, Plea Agreement at 2.  Moreover, because Mr. Thompson fully cooperated with the government, a sentence at the "low-end of the applicable advisory Guidelines range" is appropriate under the plea agreement.  *See id.* at 10, ¶ 15.  Based upon the plea agreement and the D.C. Voluntary Sentencing Guidelines, the Presentence Investigation Report ("PSR") determined that Mr. Thompson is eligible for "a short split, or probationary sentence."  PSR ¶ 204.

We respectfully request that the Court impose a sentence of 24 months' probation and 1,200 hours of community service over the course of two years.  Such a sentence is authorized by both the D.C. Voluntary Sentencing Guidelines and the plea agreement and is supported by the following factors:  Mr. Thompson's acceptance of responsibility for his misconduct; his truthful and extensive cooperation; the sentences imposed in comparable cases; and Mr. Thompson's long and well-documented record of generosity and community service.  The District of Columbia's Office of Campaign Finance opened two investigations into three related

entities in 2012. It suspended those investigations pending the outcome of this proceeding and may impose a fine at a later date. Therefore at this time we request no fine.

In making this submission, we have sought out a community service program—The Continental Societies, Inc.—that would permit Mr. Thompson to use his education and experience to continue contributing to underserved communities, as he has done throughout his life. The Continental Societies, Inc. works to foster, promote, and develop the welfare of disadvantaged families in the District and would welcome the continued service of Mr. Thompson—particularly in the areas of writing grant proposals, assisting individuals in obtaining employment and scholarship funding, and educating members of the community about making sound financial decisions—as explained in detail by Ms. Margo Briggs in a letter submitted with this memorandum. *See* Ex. M, App'x at A-33, 34. We mean no presumption by suggesting this program to the Court, but respectfully submit that such a program, consistent with Mr. Thompson's experience and past community involvement, may aid the Court in fashioning a just sentence. If the Court finds that some restraint is necessary in this case, we respectfully request that the Court impose a sentence of home confinement rather than incarceration. We ask for probation, however, in order to allow Mr. Thompson to continue his service to the community which has been a hallmark of his life.

## ARGUMENT

The D.C. Voluntary Sentencing Guidelines permit a court to take into consideration any appropriate factor other than a defendant's race, gender, marital status, ethnic origin, religious affiliation, or sexual orientation. D.C. Voluntary Sentencing Guidelines Manual §§ 3.1, 3.2 (D.C. Sentencing & Criminal Code Revision Comm'n 2013). The factors discussed below support a non-custodial sentence.

2

**I.      Mr. Thompson Has Cooperated Fully and Extensively with the Government.**

More than two years ago, on March 10, 2014, Mr. Thompson stood before this Court to plead guilty and, in a lengthy and very public plea hearing, accepted responsibility for his conduct.  He waived his right to a grand jury indictment and a jury trial, and agreed to cooperate truthfully and completely with the government.  *See* PSR ¶¶ 147, 148 (recognizing that Mr. Thompson should receive credit for acceptance of responsibility).

Before and since the entry of his guilty plea, Mr. Thompson made good on his commitment to cooperate and tell the truth.  Mr. Thompson began meeting with the government on February 14, 2014, and over the next 18 months he met with the government for approximately 16 additional debriefing sessions, with each meeting lasting for several hours including multiple all-day sessions.  In addition, Mr. Thompson spent hundreds of hours with his own lawyers outside of these sessions reviewing documents and answering specific follow-up questions posed by the government.  Throughout the course of his cooperation, Mr. Thompson answered all of the government's questions honestly and completely, providing details about his own conduct and details that assisted in the government's investigation and prosecution of others.  And he never wavered in his candor while enduring relentless questioning regarding his personal and professional life.  When the government was having difficulty obtaining the cooperation of another witness regarding Mr. Thompson's own conduct, Mr. Thompson arranged to have dinner with that witness while an FBI agent was present in the restaurant, introduced the witness to the FBI agent, and encouraged that witness to cooperate with the government and tell the truth, even if it was damaging to Mr. Thompson.  That person became a cooperating witness and he, too, assisted the government's investigation.  Mr. Thompson has done all that the government has asked of him.  Accordingly, we respectfully submit that a sentence at the "low-

end of the applicable advisory Guidelines range" is appropriate.  *See* Dkt. No. 7, Plea Agreement

at 10, ¶ 15.

## II.     A Non-Custodial Sentence Is Consistent with Sentences in Comparable Cases and Related Proceedings.

A non-custodial sentence is not only just and appropriate under the D.C. Voluntary

Guidelines and the plea agreement, but also accords with the sentences received by other

defendants involved in this investigation who cooperated extensively with the government.

**Troy White** pled guilty to a misdemeanor tax violation and received 12 months of unsupervised

probation, permitting him to move to Kenya during his probation.  White's statement of offense

includes facts indicating that he could have faced felony campaign finance charges but, like Mr.

Thompson, he cooperated with the government.  *See United States v. White*, Case No. 13-cr-256

(CKK), Statement of Offense, Dkt. No. 5.  He admitted to receiving over $600,000 from Mr.

Thompson for services provided to a 2008 presidential campaign that he failed to report on his

income tax forms.

**Howard Brooks** received 24 months' probation for a felony count of making false

statements.  Brooks, a campaign aide for former D.C. Mayor Vincent Gray's 2010 mayoral

campaign, paid another mayoral candidate to stay in the race so that the second candidate could

disparage a third candidate and increase his employer's chance of winning.  Brooks subsequently

lied to the FBI about making these payments.  His statement of offense also contains facts

indicating that he participated in making straw contributions to the Gray campaign and he

knowingly caused the Gray campaign to file reports with false statements regarding campaign

contributions.  However Brooks, like White and Mr. Thompson, substantially assisted the government in its investigation of other individuals.[1]

Brooks's non-custodial sentence stands in contrast to that of **Thomas Gore**, who pled guilty to offenses related to his participation in the payoff of the same mayoral candidate as Brooks, but was sentenced to six months in prison, followed by six months of house arrest.  Gore did not initially accept responsibility for his actions and denied participation in the payoff during meetings with law enforcement.  *See United States v. Gore*, Case No. 12-cr-129 (CKK), Statement of Offense ¶ 21, Dkt. No. 5 (reciting several untruthful statements Gore made to federal agents during a voluntary interview).  **Vernon Hawkins**, who received six months in prison for his participation in concealing the source of funds in the 2010 Gray mayoral campaign, also initially withheld information from the government.  *See United States v. Hawkins*, Case No. 13-cr-227 (CKK), Statement of Offense ¶ 28, Dkt. No. 5 (similarly, reciting several false statements Hawkins made to federal agents during a voluntary interview).  As discussed previously—and in stark contrast to Gore and Hawkins—Mr. Thompson has been completely forthright with the government and has always told the truth, from his very first debrief up to and including today.  He assisted the government in all possible manners.

No two cases are identical, but these related proceedings illustrate that individuals who consistently cooperate, accept responsibility and demonstrate candor to the government have received non-custodial sentences when pleading guilty to campaign finance related charges.  Mr.

---

[1]     The government filed a U.S.S.G. § 5K1.1 motion for downward departure based upon substantial assistance in Brooks' and White's cases.  Upon the dismissal of the federal count, Mr. Thompson will be sentenced pursuant to the D.C. Guidelines, not the U.S. Sentencing Guidelines.  So such a motion will not be filed in Mr. Thompson's case.

Thompson likewise humbly and contritely requests that the Court impose a non-custodial sentence in his case.

Such a sentence would also be consistent with the sentences of similarly-situated defendants in other investigations and would help to avoid unwarranted sentencing disparities. Many courts have declined to impose custodial sentences for campaign finance defendants with no prior criminal records, even when there were factors not present here.  For example:

- In *United States v. Chatwal*, No. 14-cr-00143 (E.D.N.Y. 2014), the defendant, a prominent hotelier, pled guilty to conspiring to violate federal campaign finance laws by reimbursing $180,000 worth of conduit contributions and tampering with a witness by instructing the witness to lie to federal agents.  He was sentenced to three years' probation.

- In *United States v. Schwartz*, No. 05-cr-00157-RMU (D.D.C. 2005), and *United States v. Cuza*, 05-cr-00344-RGK (C.D. Cal. 2005), the defendants made $102,214 in conduit contributions to 31 separate federal campaign committees, as well as to various candidates for office in California.  Schwartz was sentenced to one year of probation.  Cuza was sentenced to two years' probation.

- In *United States v. Stipe*, No. 03-cr-00128 (D.D.C. 2003), the defendant, an Oklahoma state senator, committed perjury and obstruction in connection with the government's investigation of his scheme to funnel $250,000 in illegal funds to federal congressional campaigns.  The scheme involved 39 conduit donors, who contributed almost $90,000.  He was sentenced to five years' probation, six months' home confinement, 1000 hours of community service, and a fine.

- In *United States v. D'Souza*, No. 14-cr-00034 (S.D.N.Y. 2014), on the eve of trial, the defendant pled guilty to witness tampering and violating federal campaign finance laws by contributing more than the legal limit through straw donors, and the defendant received no credit for acceptance of responsibility.  Despite the judge not being able to discern any personal acceptance of responsibility at sentencing, the defendant received five years' probation, with the first eight months in a community confinement center.

- In *United States v. Mobley*, No. 12-cr-00150 (M.D. Fla. 2013), the defendant, a Florida real estate mogul, pled guilty to reimbursing $94,500 in conduit contributions to a congressman.  He was sentenced to three years' probation.

- In *United States v. Feldman*, No. 09-cr-75 (E.D. Pa. 2009) and 08-cr-36 (D.P.R. 2008), the defendant, a prominent Philadelphia political consultant and fundraiser, was fined and not sentenced to any term of probation for his role in a scheme to

6

reimburse approximately $100,000 of contributions to the governor of Puerto Rico.

- In *United States v. Jinnah*, No. 06-cr-00383 (C.D. Cal. 2009), the defendant pled guilty to using a network of at least 20 conduits to make $53,000 in illegal contributions to two political committees. He fled the country after he was indicted. He was sentenced to three years' probation, with twelve months of home detention.

- In *United States v. Erickson*, No. 07-cr-238 (E.D. Wis. 2008), the defendant pled guilty to controlling the cash fund for a conspiracy that reimbursed more than $250,000 in campaign contributions to more than 20 candidates. He was sentenced to 18 months' probation.

- In *United States v. Troha*, No. 07-cr-00050 (E.D. Wis. 2008), Erickson's co-defendant pled guilty to orchestrating a five-year conspiracy to evade campaign contribution restrictions through conduit contributions. He was sentenced to six months' probation.

- In *United States v. Leblanc*, No. 06-mj-00091 (D.D.C. 2007), the defendant, co-founder of a health care corporation, pled guilty to violating the corporate contributions to federal political campaigns limits. He was sentenced to 12 months' probation.

Taken together, the sentences of defendants in both related and unrelated prosecutions involving violations of campaign finance laws show that a non-custodial sentence for Mr. Thompson would be just, appropriate, and proportional.

### III.   Mr. Thompson's Life Has Been Defined by His Devotion to Uplifting and Serving Others.

By every measure, Mr. Thompson has led an extraordinary life of helping others. From being born the youngest of 11 children to poor, working class parents in rural Jamaica, to immigrating to the United States in order to become the first in his family to attend college, to founding his own accounting, management, and financial consulting firm, which grew to be one of the two largest African American-owned accounting firms in the country, Mr. Thompson has defied odds at every step of his life. That he came from such meager and humble beginnings to achieve so much has made his fall from grace all the more harrowing. Throughout everything,

Mr. Thompson has given of himself—his time, money, resources, and knowledge—to assist those in need, "without publicity or fanfare." Ex. C, App'x at A-8 (Pearl Dunkley). We ask this Court to recognize that Mr. Thompson is a good man whose life has been distinguished by a devotion to helping others. He has, of course, engaged in misconduct that he regrets, but he has taken full and complete responsibility for his actions. *See* Statement of Offense, Dkt. No. 6; Ex. A, App'x at A-4 (Jeffrey Thompson). We ask this Court to impose a sentence that recognizes the lifetime of good Mr. Thompson has done, and will continue to do, if given the opportunity, in supporting and uplifting not only his family and friends, but disadvantaged individuals and communities without access to opportunities.

### A.      Upbringing and Family

Mr. Thompson's history began on April 13, 1955 in the small farming district of Bull Savannah, off the southwest coast of Jamaica, where he was born the youngest of 11 children to Myrtle and Charles Thompson. The large family's livelihood depended upon Charles working as a truck driver at the nearby bauxite mines. The family also grew food to both eat and sell for additional income. In 1967 when Mr. Thompson was still a child, tragedy struck his family twice—within six months, Mr. Thompson lost a brother and a sister. His 26-year-old sister Betsy died of kidney failure just three days before her wedding date in January 1967. Then in June 1967, his 27-year-old brother Veron drowned at sea with three other fishermen. Distraught, Mr. Thompson's mother moved three of her deceased children's children into her home and raised them. Mr. Thompson, still a teenager himself, assisted his mother in caring for his nieces and nephew, becoming a strict monitor of their homework assignments and household chores. While Mr. Thompson's mother grieved the sudden loss of two of her children, Mr. Thompson sought nurturing from his maternal grandmother, Edith, whom he helped in her grocery store and vegetable gardens.

In 1969, Mr. Thompson's mother migrated to Washington D.C. to visit one of her older

daughters, Beverly.  Soon thereafter, Mr. Thompson's mother took a job as a domestic helper to

a family in Germantown, Maryland and settled in the D.C. area.  At this time, Mr. Thompson

was still in primary school in Jamaica.  His teachers at the Bull Savannah All Age School

recognized that Mr. Thompson had the potential to excel in his studies.  Like most children in

Bull Savannah, none of Mr. Thompson's siblings had the opportunity to attend college.  As Mr.

Thompson's niece Zahra described,

> Bull Savannah [is] a small rural farming community in Jamaica,
> where countless kindergarteners each year profess their future
> profession as lawyers, doctors, and teachers.  But by the time, most
> are eleven, waiting to start high school, they soon realize that they
> too will take up the plough and less than one out of each class or
> each year reaches their goal.

Ex. S, App'x at A-45 (Zahra Roye).  But, recognizing the potential in her son, Mr. Thompson's

mother worked in the States to earn money to finance Mr. Thompson's school fees and provide

him the educational opportunities available to so few in his community.  Mr. Thompson started

his additional studies at the age of 15 and within three years passed the required exams to qualify

to become a primary school teacher.  At this point, he had already gone farther in school than

expected.  In 1973, he was fortunate enough to be hired as a sixth grade teacher at the Bethel

Primary School in the parish of Hanover; he taught during the day while attending evening

classes in accounting at the Jamaica Commercial Institute in Montego Bay.  During this same

period, he also assisted his adoptive brother Lorenzo in his grocery store and on his poultry farm.

### B.    Education and Early Professional Life

Myrtle Thompson was very proud of her youngest child's educational success, which

induced her to file the immigration paperwork that allowed Mr. Thompson to come to the United

States in order to further his studies.  On February 15, 1975, Mr. Thompson and his father

migrated to the United States, landing at the Baltimore airport with a bag full of accounting textbooks.

Mr. Thompson, his parents, and his brother Cedric moved into a one-bedroom apartment at 16th and Q Street in Northwest D.C., and Mr. Thompson began succeeding simultaneously in work and studies.  He needed to complete his GED in order to enroll in college, which he did in late 1975.  He entered Federal City College—which would later merge with two other D.C. colleges to become the University of the District of Columbia (UDC)—in 1976.  At the same time, Mr. Thompson worked full-time at the National Rifle Association (NRA), a job he found through a temp agency upon arrival in the United States.  He was trained by the NRA at the National Cash Register Company in Gaithersburg, Maryland on a new bookkeeping machine and then promoted to bookkeeper of the organization within two years.  In May 1980, Mr. Thompson graduated magna cum laude from UDC with a 3.78 GPA.  He was the top accounting graduate that year.

While this public recognition made his parents and family overwhelmingly proud, it is the humility and grace with which Mr. Thompson approached his studies, and his kindness toward others while overcoming seemingly insurmountable obstacles, that should stand out. Despite his full course and work load, Mr. Thompson made time to assist others.  In a letter to the Court, his former UDC classmate, Jillian Moore, describes meeting Mr. Thompson in an intermediate accounting class and the ways in which he shared his talents with any who asked:

> I had to complete an assignment for [h]omework and I stayed up all night trying to solve the problem and to no avail; I could not solve it.  The following day I went to school and I asked Jeffrey to assist me with solving the problem.  He took his time and explained the problem by breaking it down into an elementary process which became very simple and because of his help[,] I was able to submit my assignment on time.

> After that day, I continued speaking to Jeffrey . . . During our tenure at UDC, Jeffrey showed his kindness to all who requested his help. During that semester, I remained impressed by Jeffrey and I assessed that Jeffrey had the character of being Kindhearted, Generous, Empathetic, and very Benevolent.
>
> While interacting with Jeffrey, he never hung around after classes. I believed he was working full time while attending classes and I confirmed my thoughts because when I asked him, he confirmed that he was a full time student, while working full time and also taking a full load of classes on evenings and on Saturdays; hence the reason he could not hang out with other students.

Ex. K, App'x at A-28.

### C.     Helping Others Help Themselves: Employment and Support of Small Businesses

Mr. Thompson's spirit of giving without expecting anything in return, while simultaneously achieving immense personal success, has been a constant in his life.  After graduating UDC, Mr. Thompson got a position working for Mitchell Titus & Co., a local accounting firm.  While working for this firm, Mr. Thompson studied for and passed the CPA exam in 1981.  The next year he took a job working for the Minority Business Development Center where he wrote business plans and provided advice to small businesses in order to assist them in securing capital, better managing their finances, and growing their businesses.

At the Minority Business Development Center, Mr. Thompson helped many small minority businesses excel, a passion that he has maintained throughout his life.  Many of the letters submitted on Mr. Thompson's behalf show how his actions reflect a true understanding of the old admonition that teaching a man to fish ensures more permanent prosperity than giving him fish.  Through employment and assisting in sustaining the success of small businesses, Mr. Thompson has helped many learn to fish.  In 1983, just three years out of college, Mr. Thompson started his own accounting firm.  Through this firm and the others that followed, as many of the letters of support describe, Mr. Thompson "provided employment opportunities for hundreds of

citizens of the District of Columbia, many of them in need of a way to support their families and loved ones." Ex. W, App'x at A-50 (Everett Bellamy); *see also* Ex. Y, App'x at A-53 (Michael Rogers). In this way, Mr. Thompson has helped countless people find dignity and self-reliance. His former employees describe him as having "a passionate spirit for helping others," reflected in "the many thing[s] he has done to help others wanting nothing in return." Ex. P, App'x at A-40 (Sandra Black-Redman). One employee recalls how Mr. Thompson and the other partners at his accounting firm would often go without pay when receivables were coming in slowly in order that the staff would not miss a paycheck. Ex. B, App'x at A-5 (Beverly Howard). She reflects that "[t]o me this was not just a gesture, but something I will never forget and always appreciate because it showed me the heart of the man. As we recovered financially, [Mr. Thompson] would be the last to collect a pay check that had been held (as many as 4 or 5)." *Id.* A senior colleague writes that "[a]s an employer Mr. Thompson helped many individuals identify and sustain careers in the area of health care administration by offering employment, training and providing resources to his employees to advance their education." Ex. O, App'x at A-38 (Lavdena Orr).

Mr. Thompson also has been dedicated to helping other small businesses succeed, recognizing the societal importance of "build[ing] significant black businesses" and "creat[ing] capital access for them." Ex. G, App'x at A-17 (Marianne Spraggins). In his letter of support, Jim Gibbons describes the decades of collaboration between himself and Mr. Thompson in making positive changes in the District, particularly through the creation of opportunities for minority-owned businesses. Ex. J, App'x at A-23. Mr. Gibbons describes Mr. Thompson as "someone I could count on in my own journey to make a difference in the District of Columbia." *Id.* at A-27. A former employee, Beverly Howard, explains that she witnessed Mr. Thompson be

"a generous supporter of other small businesses which were unrelated to his company in any way." Ex. B, App'x at A-5. "Many of these companies were minority or women owned. Different owners at different times would request financial assistance to make their payrolls if they were short of necessary funds. Mr. Thompson would help knowing that some loans of this sort would not be repaid." *Id.* In her letter, Denise Lloyd-Withrow, a long-time friend and the president and CEO of an insurance brokerage and risk management agency, explains how her firm is one of the many small minority businesses that would not exist today without the help of Mr. Thompson. Ex. Q, App'x at A-42. "On January 5, 2016, I was able to celebrate 31 years of business through the Grace of God and the assistance of Jeffrey Thompson." *Id.* Another friend writes that Mr. Thompson "has been extremely instrumental in writing small business plans for the Small Business Administration . . . for many emerging companies" and she has personally known him to set up and finance at least seven to ten small businesses. Ex. M, App'x at A-33 (Margo Briggs). He has frequently donated his accounting and financial services to help establish these companies. *Id.*

### D.    Individual Acts of Kindness and Generosity of Spirit

The numerous letters attached to this memorandum attest to Mr. Thompson's generosity, service, and dedication to "making a big difference in the lives of ordinary people." Ex. J, App'x at A-27 (Jim Gibbons). Mr. Thompson has been described as generous to a fault. *See* Ex. CC, App'x at A-57 (Ermias Nessibu) ("One of his biggest flaws is that Jeff is too generous and is always looking for ways to help others because he truly cares."); Ex. M, App'x at A-32 (Margo Briggs) ("Jeff's biggest fault is his attempt to always try to help everyone at his own personal expense."); PSR ¶ 165. Michael Rogers reflects that in the 34 years he has known Mr. Thompson, Mr. Thompson "has been all about helping people." Ex. Y, App'x at A-53. He has helped family, friends, friends of friends, and strangers in numerous ways over the years, not

13

seeking anything in return.  *See* Ex. U, App'x at A-47 (Edward Robertson).  Here, we recount

just a sampling of the many examples, discussed in greater detail in the attached letters, which

have led people to describe Mr. Thompson as "a charitable, caring human being who has

positively touched the lives of hundreds of people."  Ex. C, App'x at A-8 (Pearl Dunkley).

**Family.**  Mr. Thompson has been the financial backbone of his family for many years.

Mr. Thompson has helped many family members become homeowners by assisting with down

payments; maxed out his own credit card when he first emigrated to the United States in order to

provide emergency surgery for a niece suffering from a brain aneurysm; provided financial

assistance for medical costs incurred by other siblings; assisted various family members in

paying for college; provided his parents with the best medical care available since their

retirement to Jamaica, including 24-hour home care assistance for his 98-year-old mother (Mr.

Thompson's father passed away in 2012); and assisted or paid the entire funeral costs of several

relatives.  Ex. F, App'x at A-15 (Rex & Mary Thompson); Ex. E, App'x at A-14 (Anthony

Wilson); Ex. C, App'x at A-8 (Pearl Dunkley); Ex. M, App'x at A-33 (Margo Briggs).

**Friends.**  Mr. Thompson has provided financial support to a number of friends, knowing

that often he would not be repaid.  *See* Ex. C, App'x at A-8, 9 (Pearl Dunkley) (describing the

financial support Mr. Thompson has provided to neighbors and friends in Jamaica); Ex. J, A-27

(Jim Gibbons) (describing how Mr. Thompson paid a $19,000 bill for him).  He has also

supported his friends in non-monetary ways.  One friend describes how Mr. Thompson was a

"pillar of strength" during the most difficult time of her life when her mother and sister were

murdered.  Ex. N, App'x at A-36 (Johnnie Booker).  Another friend explains how Mr. Thompson

provided her with emotional and financial support while she, a single mother of two, faced

unemployment, illness, and near homelessness.  Ex. L, App'x at A-31 (Kimberly Rice).

**Strangers.**  "I have seen Jeffrey go out beyond his every day duties to assist homeless persons living on the streets.  He does not have to know you, if he sees that assistance is needed, he does not hesitate to reach out and assist by providing them with food, medical care through his HMO and have them placed in a home or shelter.  This shows his generosity and humility."  Ex. K, App'x at A-29 (Jillian Moore).  Stephan Thompson's letter to the Court describes numerous instances in which he witnessed Mr. Thompson hear about a person in need on the news, or see a person in need on the street, and Mr. Thompson stepped up to extend his monetary and non-monetary support.  Ex. D, App'x at A-12.  Moreover, Stephan describes how Mr. Thompson encouraged and supported strangers in their journeys of self-fulfillment.  He writes:

> Many have benefited from knowing Jeff.  It did not matter your level of education, your family background, your race, sex or age, Jeff sacrificed his time, to share his advice, love, wisdom and knowledge with all.  I saw how lives were changed or influenced because of his involvement.  He would consistently stress education, tell you not to give up, write down your visions/business plans, and find out what your goals and aspirations were so he could help.  This is just who he was.  He loved helping others find direction when it came to business, education, or taking steps in life.

*Id.* at A-11.  Through his interactions with strangers, and strangers he turned in to friends, people who he expected nothing from, Mr. Thompson has shown "what it really means to have a heart for helping someone."  *Id.* at A-13.

### E.    Support of Worthy Causes

Mr. Thompson has been "a generous contributor to numerous worthy charities and causes."  Ex. B, App'x at A-5 (Beverly Howard).  "His presence in this city has made it better."  Ex. Y, App'x at A-53 (Michael Rogers).  Many letters note how for several decades Mr. Thompson has been a major supporter of the non-profit and small business community in the District.  *See* Ex. U, App'x at A-47 (Edward Robertson); Ex. W, App'x at A-50 (Everett Bellamy); Ex. Y, App'x at A-53 (Michael Rogers); Ex. Z, App'x at A-54 (Jay Taylor); Ex. BB,

15

App'x at A-56 (Robert Johnson).  In addition to monetary support, Mr. Thompson has spent a considerable amount of his personal time working with the non-profit community, drafting business plans and offering his, and his firm's, accounting services free of charge.  Ex. BB, App'x at A-56 (Robert Johnson).  By way of example, Gloria Hightower, founder of the Friends of Carter Barron Foundation of the Performing Arts, writes that Mr. Thompson helped keep her organization afloat by providing it with its first professional audit as well as a stipend when the organization was struggling, enabling it to continue standing as "the highest statistical performance-based In-school Performing Acts workforce program in D.C."  Ex. R, App'x at A-44.

Mr. Thompson also had a very personal, almost mother-son relationship with the late Dr. Dorothy Height, a civil rights icon and the long-time president of the National Council of Negro Women.  *See* Ex. J, App'x at A-27 (Jim Gibbons); Ex. G, App'x at A-17 (Marianne Spraggins); Ex. F, App'x at A-15 (Rex & Mary Thompson); Ex. N, App'x at A-36 (Johnnie Booker); Ex. V, App'x at A-49 (Christine Toney).  Mr. Thompson provided enormous support to the National Council of Negro Women and the Dorothy Height Foundation.  For example, Mr. Thompson's "generous support helped save the National Council of Negro Women from financial disaster and enabled it to become a property owner on Pennsylvania Avenue."  Ex. Y, App'x at A-53 (Michael Rogers).  In her memoir, *Open Wide The Freedom Gates*, Dr. Height describes how Mr. Thompson "gave invaluable guidance" in helping her and the National Council of Negro Women obtain funding for the purchase of its headquarters at 633 Pennsylvania Ave NW:

> The [purchase] agreement stipulated that I had to make a down payment of $500,000 by April 1, and that the deal would close on April 28.  By that day I had to find the remaining $10.5 million.

> In the ensuing weeks, we wrote letters, we made calls, and we gave speeches. We cajoled and badgered and pleaded. Some days it was hard to get even our strongest supporters to understand why this building was so important to us—and to our daughters and granddaughters. More than once during those bitter weeks I asked myself what I was doing. If the people who would benefit from this didn't want it, why was I working so hard? I had a very encouraging meeting with Dolores Jordan, mother of Michael Jordan, who in her prayerful manner reminded me of the value of holding on. And when one prospective donor was slow to fulfill his promise, Jeffrey Thompson, a master of financial matters, helped find a solution, as he has done for many years.

Dorothy Height, *Open Wide The Freedom Gates* 276 (2003). The National Council of Negro Women building is the only property owned by African Americans between the U.S. Capitol and the White House and sits on the historic site where the slave trade was last conducted in the District.

Mr. Thompson assisted in the purchase of $200,000 of fitness equipment for a physical fitness facility for the residents of Southeast D.C., a joint venture between the Union Temple Baptist Church and the Salvation Army. Ex. T, App'x at A-46 (Rev. Willie Wilson). He gave "immeasurable support" to this church's community festival Unifest. *Id.* Union Temple Baptist Church's pastor reveled at how Mr. Thompson "never sought personal acclaim or public acknowledgment," but responded to gratitude with "to God be the glory." *Id.* At another historic Washington church, Metropolitan A.M.E. Church, Mr. Thompson paid for the carpeting of the sanctuary and extended himself to assist in other ministries. Ex. AA, App'x at A-55 (Rev. William H. Lamar IV).

In a letter describing Mr. Thompson's philanthropic efforts to help others learn to fish for themselves, Dwayne Ashley, the former president and CEO of the Thurgood Marshall Scholarship Fund, writes that Mr. Thompson "has a deep and unwavering passion for students and higher education, and a longstanding history of giving generously and consistently to causes

that support students."  Ex. H, App'x at A-19 (Dwayne Ashley).  "He fought ardently for the

formation of UDC Community College, to insure that students, who may not be successful

initially, in a four year university, w[ere] afforded the opportunity to begin at the community

college level, thus increasing their chances of success."  Ex. Q, App'x at A-42 (Denise Lloyd-

Withrow).  He "gave an abundance of support to the DC Public School youth working with the

Continental Societies, Inc.," the organization with which we have proposed he continue service

as part of his sentence in this case.  Ex. M, App'x at A-33 (Margo Briggs).  Another friend

explains how Mr. Thompson encourages the leaders of tomorrow to stay in school and attend

college, focusing on their studies which will benefit them in the long run.  Ex. K, App'x at A-29

(Jillian Moore).  Moreover, Mr. Thompson and his businesses provide funding for tuition to

many students and for scholarships and program support to non-profits such as the Bethune

DuBois Scholarship Fund, 100 Black Men of America, the Thurgood Marshall Scholarship

Fund, UDC Foundation, Young People on the Rise, the Ron Brown Foundation, and the

Rainbow Coalition.  *Id.* at A-30.

In his hometown of Bull Savannah, Jamaica, Mr. Thompson built a computer laboratory

at the Bull Savannah Primary School, the same school that educated him, his parents and his

siblings, and continues to educate many of his grand and great grand nieces and nephews.  As

one niece explains, "[t]hat lab now teaches over 400 students annually, the skills of computing in

the 21st century, an indelible, and long lasting contribution to many whom, without this

computer lab that he created, would have no computer technology training.  Here is a man, who

will pull thousands of poor, rural farm folk into a global world where modern skills make an

ever-so stark difference."  Ex. S, App'x at A-45 (Zahra Roye).  Mr. Thompson has never

forgotten the people of Bull Savannah.  He has made a vow to start an endowment fund for the

school and have it renamed in honor of his grandmother, Edith Elliott.  He visits his mother periodically, and always extends financial help to many neighbors and friends to fund their medical bills, children's school fees and books, farming expenses, housing repairs, transportation costs, and other critical needs.  Every Christmas, he sends financial assistance to many elderly neighbors who nurtured him as a young boy and to his former classmates.  His Aunt Pearl, who lives in Jamaica, relates numerous stories of Mr. Thompson's "charitable giving in this rural impoverished community" both on the individual level and grander scale, including making major repairs to his primary school in the wake of Hurricane Ivan in 2005.  Ex. C, App'x at A-8, 9 (Pearl Dunkley).

Mr. Thompson's financial and programmatic support of non-profit organizations has been vast.  He has contributed to many charitable causes, either personally or through his companies, including the Duke Ellington School of the Arts; the Children's Hospital; the Mary Center for Maternal and Child Care; the Whitman-Walker Clinic; the Max Robinson Clinic; the Providence Hospital Foundation; the United Planning Organization; the University of the District of Columbia Foundation; the Citizens' Education Fund; Operation PUSH; the Metropolitan A.M.E. Church; the Dorothy Height Foundation; The Links, Inc.; Alpha Kappa Alpha Sorority, Inc.; Alpha Phi Alpha Fraternity, Inc.; The High Tea Society–Girls Connected; American Friends of Jamaica; the Lincoln Theater Foundation; Howard University School of Medicine; Howard University School of Business; the Anacostia Community Fitness Center; the United Medical Center Foundation; the D.C. area chapter of the American Cancer Society; So Others May Eat (SOME); the Washington Urban League; the D.C. Chamber of Commerce; the D.C. Campaign to Prevent Teen Pregnancy; the National Museum of African Art; UNICEF; the National Association for the Advancement of Colored People; the National Council of Negro

Women; the Continental Societies, Inc.; the National Urban League; 100 Black Men of America; the Thurgood Marshall Scholarship Fund; the Medgar Evers Foundation; RAP, Inc.; Capital City Striders Track Team; and the Bethune DuBois Scholarship Fund.

And his dedication to serving others has not ceased in the wake of his current situation. Since losing his businesses and pleading guilty in this case, Mr. Thompson has continued to serve his communities in the metropolitan Washington area and in Jamaica.  Since 2014, Mr. Thompson has made monetary and in-kind donations to the Friends of Carter Barron Foundation; the D.C. Maryland Virginia Caribbean Students Association; the Continental Societies, Inc.; Helping Hands, Inc. (a Southeast D.C. non-profit that solicits excess food, clothing, and household items from local distributors and donates them to needy people in Wards 7 and 8); the David "Wagg" Hunt Scholarship Fund (a scholarship fund for needy students in Jamaica); the First Wesleyan Church; and the Reid Temple A.M.E. Church.  He also donated to and volunteered at a Christmas Toy Drive put on by the Friends of D.C. Parks and Recreation Department.  He has continued to mentor and encourage small business owners and directors of non-profits.  Just last summer, Mr. Thompson learned in the news that a young girl in Kingston, Jamaica, needed an emergency pacemaker in order to survive.  So, he bought a new pacemaker and paid to have it successfully implanted to save Ms. Shinnia Porteus.  Ex. C, App'x at A-9 (Pearl Dunkley).  "This random act of kindness to a stranger" exemplifies what Mr. Thompson's life has been, and will continue to be.  *Id.*  A friend recounts how Mr. Thompson recently showed "his bigheartedness, which is both spontaneous and unstinting":  "We were at a restaurant where he was telling me about his current circumstance.  When he learned that our waiter was a struggling college student, he not only took the time to ask about his studies and

career plans, he volunteered to help him find employment." Ex. G, App'x at A-17, 18 (Marianne Spraggins).

Mr. Thompson "has unselfishly shared his time and talent to help individuals of all ages and socio-economic status." Ex. O, App'x at A-39 (Lavdena Orr). We respectfully submit that Mr. Thompson's long history of generosity and community service militates strongly in favor of a sentence that permits substantial community service in lieu of incarceration or home confinement. The words of two friends succinctly explain the point: "I do not think that society would benefit from sending Jeffrey to jail . . . a prison sentence would be detrimental to all concerned. His generosity, compassion, community spirit and knowledge would surely be missed." Ex. MM, App'x at A-71 (Shirley Kibunja); "We need Mr. Thompson in our community, not away from our community." Ex. LL, App'x at A-69 (Andrea Sullivan).

## CONCLUSION

The Court need not send Mr. Thompson to jail to impose a just sentence and achieve the goals of deterrence. With regard to specific deterrence, Mr. Thompson has no chance of recidivism. As his niece stated in her letter to the Court, Mr. Thompson has "gotten the message loud and clear." Ex. S, App'x at A-45 (Zahra Roye). Further, Mr. Thompson has already endured significant (and public) consequences for the actions he has acknowledged: a felony conviction; the loss of his accounting firm; the loss of his health care company; the shredding of his reputation; public humiliation; and media disclosure of the most personal and intimate details of his life. As one friend writes, Mr. Thompson "has paid dearly for [his] mistake. He has lost his businesses, which he spent 30 years building, and therefore, his livelihood. Most importantly, though he has lost his reputation and good standing in his community for which he is ashamed and remorseful." Ex. Q, App'x at A-42 (Denise Lloyd-Withrow). Many have "treated him as a leper." *Id.*

All that he has already suffered, in addition to a considerable term of probation and community service, and other conditions the Court may set, constitute a just punishment for Mr. Thompson and significant deterrence to others.  Moreover, Mr. Thompson's dedication to helping others further supports imposing a probationary sentence that would permit him to continue serving the community.  The words of his pastor Rev. William H. Lamar IV hold credence: "[t]here is much to read about Mr. Thompson in the local press.  There is much to see on television and social media.  Mr. Thompson is fallible, as are we all.  But the narrative about him is one-dimensional and sensationalized.  A heart of compassion and service beats inside this gentleman."  Ex. AA, App'x at A-55.

For the foregoing reasons, Mr. Thompson respectfully asks this Court to impose a sentence of 24 months of probation that includes 1,200 hours of community service over the course of two years.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP


By:   /s/ Alex G. Romain
Tobin J. Romero (D.C. Bar No. 461273)
Alex G. Romain (D.C. Bar No. 468508)
J. Liat Rome (D.C. Bar No. pending)
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000

*Attorneys for Defendant Jeffrey E. Thompson*


Dated: July 15, 2016

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 15th day of July, 2016, I electronically filed the foregoing

Memorandum in Aid of Sentencing using the CM/ECF system, which will send notification of

such filing to all counsel of record.


        /s/ Alex G. Romain
        Alex G. Romain
        Counsel for Defendant Jeffrey Thompson